And we will move on to the third argument set for today, which is Nielsen v. O'Malley, case number 23-35619. Mr. Hatfield Yes, good morning, your honors. I plead the court. I am Chad Hatfield representing Ms. Nielsen in her appeal of the administrative law judge ALJ's denial of her social security disability benefits. The standard of review is a de novo review of the ALJ's decision. I do wish to reserve two minutes for rebuttal. The primary contention of the commissioner in this case is that if there are alternative rational interpretations of the evidence, then the ALJ's decision should not be overturned. However, that test cannot be that if the ALJ misinterprets the evidence, takes the evidence out of context, misses certain evidence, then the evidence with support conclusion should not be overturned. To say reasonable minds could come to different conclusions does not override the ALJ's duty to properly consider all evidence. In doing so, that would be the prohibited activity by this court of cherry picking the evidence. In this claim, we see that Ms. Nielsen has not claimed that she doesn't have the cognitive ability to maintain attention or focus. She concedes that within confines of her own home, she's able to play little games on her phone. She's able to have tele video visits with her mental health provider on most days, able to watch TV and do that. By leaving her home, she says she must take for appointments two days to calm herself down, engages in self-cutting behavior to build emotional pain. She's able to leave only with the companionship of her fiance, is able to make it through 45 to 60 minutes during an appointment, must rush immediately home. This is her contention disability. Now, the reason what the ALJ, his findings, it's really important to find what the ALJ actually found for dismissiveness. So, when the social security system of the state agency hired a consultant, Dr. Anderson, to do a psychological consultative examination, Dr. Anderson found her tendency to isolate mood symptoms, not due to cognitive impairment, due to mood symptoms and tendency to isolate, her ability to maintain attendance in the workplace is markedly impaired. To this, the ALJ said, there is no supporting evidence of a marked rating for attendance issue. It's really important that we stay to the reasons the ALJ offered for rejecting this opinion. We see throughout the record, she underwent a psychological evaluation from the social security source, Dr. Anderson, also the state agency source, Dr. Islam Zor, underwent a review of that by Dr. Harmon, which the ALJ failed to address, and then had this opinion of her treating psychologist, Ms. Weld, which all give support for a marked limitation in attendance. The vocational expert found that even missing more than one day per month would preclude all employment. The ALJ said there's no supporting evidence for this. I'd like to go through the ALJ gave a string citation used for all sources, except for the one he forgot to mention, Dr. Harmon. Excuse me. Yes. Of the string citation, a lot of them seem to be non-mental health practitioners who were just doing some boilerplate thing about how she looked when she walked in and she looked happy. But some of them were not, right? Were some of them from mental health examiners who said she, her mood was okay today, or she was denying any suicidal ideation, or she was denying hallucinations at some times. Right. That's correct, Your Honor. And it's important to know, yes, physical examinations, even the physical CE, which the ALJ said it wasn't even supported on the physical side. So the mental health exams, we have, the ALJ cited Dr. Islam Zor's examination, which he found did on its own support her limitations of marked impairment. So it's unclear why he cited that one. And the other one cited were all telehealth appointments, where she was doing within the confines of her own home. And even on those, for example, CAR-792, 794, the ALJ said, you know, this is normal. It did show current suicidal ideation, but an occasional auditory visual hallucinations. Other appointments, she said she's not having any current suicidal ideations. She's not currently having hallucinations. Again, taken within her home. And we see that, for example, CAR, page 613, says, you know, due to the COVID pandemic, this is doing by televideo from her own home. So again, most of the citations... So your point is that since her main problem was leaving the house, that how she felt when she was in her house was really not the relevant criteria. Correct, Your Honor. And that's exactly the issue. So most of the citations the ALJ gives is to cog into functioning. Her attention, her concentration are doing well when she's around a home or for a brief appointment. But that's not really the contention that Ms. Nielsen stating that keeps her from competitive employment. And we go through most of the citations, the records the ALJ provides are from that June 2019, November 2019, which DDS had with these physical findings, where she has some things where wasn't currently suicidal. My briefing goes through many, many things in 2020 and 2021, where she was having auditory hallucinations, where anxiety got bad, but not all the time. I mean, she said three or four days a week, she could not leave her house, not every day. And when she did, it was only for short periods of time. But the ALJ never does say why that is inconsistent. If she can do computer games on her phone, he cites to this, or go to church service, how that would equate to a 40 hour work week, particularly when her church service was for I think 30 to 60 minutes, and she left half the times and hadn't been the last two and a half, three months, just further support even the ALJs, what he's found, how she functions out of the home really does support her claim of disability. The other things are really important. Dr. Harmon, that was not even addressed. And this was not just a box check. Dr. Harmon said, Dr. Islam Zawart's opinion, I agree with. She provided a narrative, and she stated reasons that the ALJ specifically stated for reasons for rejecting Dr. Islam Zawart's opinion. She said that even with her care, and her mental health treatment, her past history of substance abuse, she would still not be able to function adequately in the workplace, and that the mark level limitations for attendance issues would still be supported. The ALJ did put in a limitation to no public contact. But again, at the very outset of the hearing, the very beginning, the alleged onset date was stated to be on the date where she had to quit her semi-truck driving job due to having suicidal thoughts. There is absolutely no public contact in a semi-truck driving position. And so it just shows that the ALJ's RFC does not adequately address the contentions of the substance disability opinion. Was Dr. Harmon a record review person, or what was her role? Yes, she's hired to review the records. I see. Hired by the agency? She's hired by the state agency to review whether it would likely meet the social security criteria. The way the state agency, the state disability office works, is that they will approve for age-blind disabled benefits while someone's awaiting their SSI claims, but they want to have a reviewer review whether it's likely to prevail on a social security claim. If it does, they'll approve it. If not, then they don't give the benefits. Dr. Harmon did feel that it would meet the test of social security's, I guess, criteria for disability. So that is a record review. Just to be clear, because I thought Dr. Harmon looked specifically at Nielsen. Oh, she did review the medical records and Dr. Islam Zwart's report, right? Right. And like I said, she gave a basis for it. She wrote a narrative. She explained why this was a decision. It's important because the ALJ made a lay finding specifically on this issue and did not see that there was a PhD who made the exact same finding contrary to his own. So if Dr. Harmon only did a record review, why was it so harmful that the ALJ did not independently consider her opinion because all she did was look at what was otherwise already in the record? Well, because it comes down to the ALJ said there was no support for mark limitations in attendance. That's what he found, no support. When you have another PhD who reviewed the same thing and said, hey, there is support in the record. Dr. Islam Zwart, the judge said, hey, there's no support in the rest of the records for this. Dr. Islam isn't even what you're relying on. I thought it was Dr. Anderson. Well, they all are, your honor. They all found limitations, severe limitations in attendance issues. They're all consistent. I think that's the point. All of the people who saw her like this found marked limitations. Dr. Harmon reviewed that and also found the marked limitations in attendance issues. Well, any of the people who gave the opposing opinion, did any of them actually see her? No, that was DDS and they only had cited records from November of 2019. I'm sorry, they only had one? They were all reviewing sources and they only had records to November of 2019. And they were, but they were all just reviewers. Correct. And they, he did rely on those, but Dr. Harmon, who was also a reviewer, he ignored. Correct. Okay. And as to Bridget Anderson, you quoted one sentence, but then there was a second sentence. Let me read both sentences. I'm not sure this is fatal to you, but I just want to make sure that we're focused on this. Dr. Anderson writes, first, due to her mood symptoms, her tendency to isolate, her ability to maintain regular attendance in the workplace is markedly impaired. Then Dr. Anderson writes, her ability to complete a normal work week or work day without interruption from mood symptoms is likely moderately impaired. So the first sentence, markedly impaired, second sentence, moderately impaired. She's, Dr. Anderson, of course, is describing different things, but what are we to do with the moderately impaired in that second sentence? Well, it's supposed to be good days, bad days. She's not going to show up on her bad days. That's what she stated. On the days where she's having better days, I mean, she did openly concede she can play games on her phone, go to the church sometimes. And so that, I guess, dropped to a moderate level as far as, you know, being able to maintain concentration and attention on her days. Not every day is the same. And she never states that she cannot, you know, like watch TV all day and are good days within the confines of her home. That just is not what she stated. She wasn't special education. You're not really addressing my question. Both of those sentences by Dr. Anderson address not what she's doing at home, but rather whether she can go to work. And in the first one, she says her regular attendance is markedly impaired. Second one, complete a normal work day without interruption, moderately impaired. So I'm going to take it that, well, if we're looking at more than a normal work week or work day, which is the second sentence, moderately impaired, then if we're maybe looking at a longer period, we're talking about markedly impaired. I'm trying to figure out what Dr. Anderson's telling us, and then how do we fit it into what constitutes a disability? Correct. So we would say that the attendance is being able to show up regularly each day. Complete a normal work day. Work week is once you show up and you're there, are you able to stay throughout your shift? Are you able to maintain attention while you are there at the workplace? Her problem is getting out of the house. Right. So if she gets out of the maybe moderately, moderately. Yeah. Yeah. It's just not markedly on those days. Okay. Okay. We'll give you a couple of minutes for rebuttal. Thank you. Good morning again, your honors. Joseph Lankheimer on behalf of the commissioner. I felt like I just did this. There's no question that Ms. Nelson does have psychological impairments that she's limited. You know, the ALJ included a lot of limitations in this residual functional capacity, limited her to simple routine tasks, occasional and simple changes, no fast paced tasks, no public interaction at all, occasional superficial interaction with coworkers. Her contention that she has real problems leaving her house. Right. Right. Does he deal with that? I don't even think he mentions it. Oh, he does. The ALJ talks about her allegations starting on page 22 of the ALJ's decision. The ALJ is talking about her testimony on that first paragraph. And near the end, the ALJ says, is talking about the page 22 of the administrative laws. I thought it was a 17 page opinion. Oh, I'm sorry. It says page seven of 17 at the top. I'm talking about the bait stamped at the bottom, the 22. Wait, help me. That's not helping me. Okay. So in the record, what page of the opinion is this? Page seven. Page seven of 17. Exactly. Okay. Go ahead. Okay. So at the bottom of that first full paragraph, the ALJ is talking about her testimony about the difficulties that she has leaving the home. You know, that she's engaging in this really dramatic behavior every time she leaves the house. She testified that she leaves the house only twice a week. So the ALJ is acknowledging that. Repeating what she said, but he never deals with that. Well, I. Believing it or not believing it or why he doesn't believe it or anything about it. So I would, I would disagree with that, your honor. And if you look at that next paragraph, this is the ALJ's segue into analyzing these subjective complaints. And what follows is a very lengthy analysis of the medical records. First, with respect to her allegations about knee pain. And then following that on page 25. It's basically saying, look, I agree with this assessment, but I think she's exaggerating. I wouldn't say that the ALJ is finding that she's necessarily exaggerating, but is, is her subjective complaints are not comporting with what the medical records are showing. And we see. The claimant statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence. Exactly. And that. Medical evidence is two people. Is this correct? Two doctors who reviewed the record in 2019. And then the rest of the people who did support her, her. Her testimony. Right. I mean, is that what we have? Do we have any examining or treating or anybody from after 2019? Any medical person who says that this isn't so? Well, we certainly have the, the opinions of the sources that your honor identified, but we also have all of the hundreds of pages. And they were only reviewing records. Correct. We have those, we have those findings, but we also have hundreds of pages of medical records that the ALJ looked through. And that's what, that's what the medical records were. Those medical records were primarily not mental health practitioners. I disagree with that characterization. I know that, that that's an argument that the claimant has made, but which ones were, I mean, because I, I wasn't seeing a lot that were mental health, but there was, there were statements in there that went to mental health that she's self-reported saying that I don't have any suicidal tendencies and things like that. That's that is correct. There are, there also are mental health treatment records. You know, my colleague mentioned them today that. Sure. In the decision or in our brief? Okay. Sure. A page, if you look at, I think it's page 14 is kind of this, the main string site. It's just hard to see unless you walk through all of it because all it, it doesn't really say, all it says is exhibits. It just gets, you know. Sure. I mean, I mean, we. Any of these exhibits that are mental health. Yes. I mean, if we actually go a little bit earlier, Nelson to page 10 of 17 this is where the LJ starts talking about the psychological evidence at the top of the page there, you know, they'll just pointed out how she has a consultative psychological evaluation there. And, you know, look at what the LJ is pointing out that, you know, yes, she's making these complaints, but, you know, there's findings about being cooperative. She's making fair eye contact. She's denying hallucinations. You know, we move on to April, 2021, where here's the LJ talking about how she had a psychotherapy video visit. So. Exhibit 5F. Yes. The, the psych, this, the consultative psychological evaluation is exhibit 5F. 13F is all is the May, 2020. Is that also a psych? I guess that must be a psychological. I believe it is. I would have to pull up the record for that, but it does indicate that she took a, a, you know, a mental health examination and no, no depression. And that's at page 156 of 13F. So I think to your, your honor's point, Judge Berzon and talking about, well, you know, what is the medical evidence that the ALJ had? Well, we see the LJ kind of going through these records and when talking about these non-examining doctors from the state agency let me get there. Dr. Haney and Dr. Forsyth. It's true that those doctors only reviewed records up through 2019. Frankly, that's just part of how the administrative process works. We have these state agency doctors who look at these claims in the initial and reconsideration phases. But when the agency sent her to, for evaluations to those people all said otherwise. Well, the agents and I just, just so I can make a correction here. I, I think. Wasn't Anderson one of those people? Anderson was one of those people, a consultative examiner. Harmon was not. I wanted to make a correction there. I, I, I, I believe that was that was an incorrect statement. Harmon actually is a contractor for the, for the Washington department of social and health services. That's a different agency. That's not associated with social security, but somebody chosen by, but Dr. Harmon reviewed only another DSHS opinion, this Dr. Islam Zwart and essentially rubber stamped it. It's, if you look at, if you compare the checkboxes. It's an additional that's added. That's correct. He rises or falls with what we view of Islam. That's that, that's what that's correct. Yes. What is the support for the statement that there was no medical evidence supporting Dr. Anderson's conclusion that she was markedly impaired in attendance? Well, the, the evidence is that Dr. Anderson, Dr. Anderson did not cite any clinical evidence for it. And Judge Fletcher, you were making this. So ultimately, isn't the problem here that when she says, I don't leave my house, I can't leave my house. There's no way for anybody to observe that. How would anybody observe it? Well, I mean, that's, that's a fair point, Your Honor. I mean, there's not necessarily somebody there, you know, every time she's experiencing this, but, but so, so you have to ask yourself, what does the LJ do with an allegation like that? What does the LJ do? The LJ has to look at the medical records. The LJ has to look at the claimants activity levels, things like that to glean, to test essentially the reliability of the, she agrees that if she's in her house, she can do things, but she has terrible panic attacks and she can't leave her house and she, and so on. And at least some of these mental health people seem to believe her, but I don't know how you'd ever prove it up. Well, I think her, I think it's telling to actually look at what she, what her subjective complaints were because they were, they were pretty extreme. She, she says that she, that's objective actually, is she leaving her house or not, but nobody knows. Well, it's, it's, it's her making these statements. Um, again, as Your Honor points out, there's, there's not really maybe an objective way to measure that. It's just, is she leaving or not? But she's saying she can't leave because of, she said she has panic attacks if she even got near her front door and that she has suicidal thoughts no matter where she was. So that would include in her house too. What does the ALJ have to look at? Well, what did the medical records show? And if they show whether or not she's at appointments, cause there actually were quite a few medical records where she went to appointments, she did get out of the house and go, as well as the telehealth visits that she had. And when we see how she is behaving, even in her house where she's claiming that she has, even in her house, she's having these panic attacks if she gets near the door or, and then she's reporting that she's not. And they're seeing, and they're seeing things like good judgment, good mood, good insight. Page 14. Is that what, cause that is the confusion here is that the ALJ says, I find this opinion, talking about Anderson, generally persuasive, except there is no supporting evidence of a marked rating for attendance issues. And I think that's what we're getting caught up on is when it says no supporting evidence, is he saying that Anderson doesn't provide supporting evidence or is he, is the ALJ saying there's no supporting evidence at all in the record? I think the ALJ is certainly talking about Dr. Anderson's opinion there, because if you look at what Dr. Anderson says on page 452 of the administrative record, that's again at the bottom right-hand corner. And Judge Fletcher, you were, you were, you were discussing this. There is this statement about, you know, due to her mood symptoms, her tendency to isolate, her ability to maintain regular attendance is markedly impaired. Well, where did, where did, where did Dr. Anderson get the allegation about her tendency to isolate? Well, right up at the top of this page, Dr. Anderson says, claimant reports that she is extremely self-isolating. So under Social Security's regulations, when you're evaluating medical opinions, you're looking at two primary things. Number one, does the opinion contain objective medical support and explanation? And number two, is, does, is it consistent with the overall record? And that first prong, the supportability, well, what is, what is Dr. Anderson citing as a basis for these attendance problems? Well, you know, really the only thing we can see here is just the claimant's own complaints. And that's not corroborated as we talked about earlier. That's really, those extreme complaints aren't necessarily corroborated by all of these medical records that are showing intact mental functioning. And Judge Fletcher, you're right. She does say, Dr. Anderson then does go on to say that her ability to complete a normal work week or work day without interruption from mood symptoms is likely moderately impaired. And earlier in that functional assessment on the prior page, Dr. Anderson also says the claimant appears to have a clear ability to reason and understand only mild impairments in sustained concentration. The ALJ actually did not reject this opinion outright. If you look at what the ALJ did with Dr. Anderson's opinion on page 14 of 17 at the top, gave it, gave most of it persuasive value. Credits it except to the point that's relevant to the disability. Well, credits that I think to the, to, I mean, that's true. I mean, to the, I mean, because I do agree that the markedly... That is to say the ALJ credits everything except the critical sentences here. Well, the critical sentence though, did not have support. And that, that's the point that the ALJ is making with respect to... Well, it does have support in the sense that that's, that's what the claimant reported to Dr. Anderson. So that's clearly support. That's right. But there was no objective support. And if we steer it back to what the ALJ said earlier about all of these medical records and her intact functioning... The problem is, I think the problem is how the ALJ wrote this because the ALJ says there's no support for the attendance issues. But then if you go through the rest of that paragraph, a lot of it doesn't really relate to attendance issues. So there's, there is some inconsistency here. And I guess the question is, is it enough that this needs to be re-reviewed and I would, I would submit the answer is no. I mean, we have to ask ourselves, well, what is the, what's the basis? I mean, what would be the basis for her allegations about the attendance issues? You know, she's describing, you know, severe anxiety, you know, hallucinations, suicidal thoughts. It's these medical symptoms that she's describing that are, you know, that are resulting in what, you know, she's claiming and what this doctor has, you know, basically repeated would the problem with her attending work. And when we go to the core of those medical impairments, when we look at the medical records, which, you know, we've, you know, cited in our, our, our briefing, they are fairly consistent, whether or not it's a telehealth or whether or not it's in person that she is, you know, able to function, you know, relatively well. She's having a normal mood, concentration, all things that we, you know, we're seeing, you know, that are undermining this, this argument that she would be unable to attend work. Okay. And I do see that I'm over my time. So I will, but you've been very asked the court. Okay. We'll give, we'll give a couple of minutes for rebuttal. All right. Thank you, your honor. So this has already been addressed by this court and Buck Pearson, Barry Hill. Psychiatry is different than physical complaints. You can observe all the clinical signs. If that were so nightmares, you could just completely ignore from the social security system. Nobody observes somebody sleeping and waking up with nightmares. You can't do it. And when she says she has anxiety attacks, it's when she's attempting to leave the home, which is actually what is this social security listings for mental health talks about anxiety panic attacks is when you have the preemptive anxiety of having to leave the home. If she's having a telehealth visit, she's not not having to leave the home. And we'll also look at the string citate the citations in my briefing. There are more citations to abnormal mental examinations than the ALJ provided. For example, the commissioner keeps bringing up the ALJ's reference to April 9th, 2021, the normal mental status examination. April 14th is an abnormal mental status examination still within the home. That's just five days later. And like I said, there's more abnormal mental status examinations than there are normal. Probably the only thing that's not true for that is cognitive functioning. But that's not the basis of her disability is attention being oriented to person, place, thing. So when we look at this, I mean, at page 11, this May 2021 psychological evaluation, it reports back everything herself reporting problems. But then it said when examined, her thought process and content were within normal limits, as was her orientation. There was some indication of cognitive difficulty. I understand that doesn't address it. But then it says her mental status and fund of information were within normal limits. She was diagnosed. I mean, why doesn't that sort of address? I mean, that is a mental examiner who said that her mental status and fund of information were within normal limits. Right. And that's just she put recent suicidal ideation, not current suicidal ideation. And that sounds like a like a cognitive assessment, because everything before and afterwards is a cognitive assessment. It doesn't have any indication of it being a mental health assessment. Well, this is a psychological evaluation. Yeah, but it's about everything she's talking about is about cognitive issues. You know, I should know this, but I don't. She is under for that paragraph we're talking about who is evaluating her. The ALJ doesn't tell us who is this is making this evaluation in May of 2021. Do you know who she saw? Oh, I believe that as well. But let me I'd have to look at that, actually. It's exhibit 11 F, but I didn't go back and look. OK, so you don't know what you as you sit here, you don't know. OK. OK. Yeah, so, I mean, that is entirely the waxing and waning is probably the most common error we see for judges in evaluating mental health, as we see here. But again, when she comes through this telehealth visit, she's recounting what's happened the last two weeks before and doing these things. And she's already testified that she's having a really bad day. Her fiance reschedules her appointments for her. So we're not expecting her to have auditory and active visual hallucinations during these visits. But she is noted to have anxiety and be sad and poor mood on numerous mental status examinations. And like I said, the briefing has more of those than it does the other way down. I did look and it was Josephine Phillips at that time was a nurse practitioner for medication management on that one. I'm sorry. Take note. May 21. Say that again. It was the it was the nurse practitioner who prescribes medications. Well, as a nurse practitioner, that seems OK. We'll take a look at that because it's the nurse practitioner can do a psychological evaluation. They're allowed to. Yeah. Was the May 2021 person the nurse practitioner? I think that's what you were saying. Well, the May 12 one there, I mean, they go back and forth. And that's if she sees the medication management and then there are we'll take. I mean, the real question is exhibit 11 F and we can pull that up. So. All right. I think I think we've you've helped get us into the record of this deep case. And we appreciate both council's efforts in helping us We're going to take a brief recess and then we'll be back to hear argument in the final two cases.
judges: FLETCHER, BERZON, NELSON